In re KDI CORPORATION, Debtor.

HAGEN SIGN CORPORATION,
Claimant,

v.

KDI CORPORATION, Debtor.

Bankruptcy No. 61463.

United States Bankruptcy Court,
S. D. Ohio, W. D.

Jan. 11, 1980.

**504**

James W. Halloran, Jeffrey P. Harris, Cors, Hair & Hartsock, Cincinnati, Ohio, for appellee/debtor.

Benjamin Gettler, Dennis J. Buckley, Gettler & Katz, Cincinnati, Ohio, for appellant/creditor.

### OPINION

BURTON PERLMAN, Bankruptcy Judge.

In this Chapter XI proceeding, claimant Hagen Sign Corporation filed a proof of claim on August 30, 1972. The claim recites that it is filed as a priority claim in the amount of $319,149.00, the claim arising from the guarantee of debtor of the obligations of KDI Hagen Corporation which entered into an agreement with Hagen Sign whereby KDI Hagen sold its assets to Hagen Sign. On September 29, 1978, claimant filed an amended proof of claim, increasing the amount sought to $359,149.00, including $50,000.00 attorneys fees and $25,000.00 ac-
countants fees. Debtor has objected to the claim, saying it "is not justly or truly indebted" to the claimant.

### I. INTRODUCTION.

On May 18, 1979, we entered our decision on burden of proof in this case. We concluded that the claimant stood in the position of plaintiff in this case, and that the burden of proof rested upon it to prove its claim. We held further that claimant must present a prima facie case and thereupon the burden of going forward shifted to the debtor. We said that in view of Bankruptcy Rules 301(b) and 302(c), a prima facie case as to validity and the amount of claim would have been presented when claimant had filed the contract upon which it relied. This was done in conjunction with the filing of the proof of claim itself. In addition, we said that a certificate by Alexander Grant indicating conformity with the requirements of the agreement was also necessary and this would complete the prima facie case of plaintiff. We also held that the contention of debtor that Alexander Grant was not acting independently, and that the audit did not conform to the provision of the contract calling for application of generally accepted accounting principles etc., were not matters of affirmative defense as to which debtor had the burden of proof. We held instead that they were simply matters of defense regarding the contentions asserted by claimant. Finally, we held that the burden of proof upon claimant was to prove its case by a preponderance of the evidence.

Debtor defendant is a conglomerate, which on September 20, 1969, acquired a company called Hagen Advertising Displays from one Leonard Hagen. The assets of Hagen Advertising were transferred to a new entity known as KDI Hagen Corporation (hereafter "KDI Hagen"). Subsequently, on December 29, 1970, debtor KDI, having encountered financial difficulties and needing cash, divested itself of the company which it had acquired, by entering into an agreement on December 29, 1970, with Hagen Sign Corp. (hereafter "Hagen Sign"), a new entity formed by its principal,

Lloyd Miller, for the purpose of the acquisition. Hagen Sign is a wholly owned subsidiary of Schaefer's Bakery, another Miller enterprise. Closing was held January 14, 1971. On December 30, 1970, debtor filed for relief under Chapter XI of the Bankruptcy Act. The sale price of KDI Hagen to Hagen Sign was one million dollars with $200,000.00 being withheld by the purchaser.

The agreement between the parties in para. 5 sec. (c) stated:

"As soon as possible after January 1, 1971, an examination is to be conducted by Alexander Grant & Company certified public accountants, of the balance sheet of KDI Hagen Corporation as of October 31, 1970, to be prepared in accordance with generally accepted accounting principles applied on a basis consistent with that of seller's preceding fiscal period."

It is the position of debtor that claimant can only succeed here if it can establish that there was compliance with this paragraph, and in addition the result of the audit shows that the figures set out in a balance sheet Exhibit B attached to the agreement, required adjustment in claimant's favor. Claimant does not see the issues as so limited, asserting that it has independent grounds for recovery because of breaches of express warranties to be found in the agreement. Debtor contends that the audit of Alexander Grant was not prepared in accordance with generally accepted accounting principles and applied on a basis consistent with that of seller's preceding fiscal period, and therefore, a contract condition, prerequisite to performance by debtor, was not performed.

As we have noted, together with its proof of claim, claimant filed in support thereof a copy of the agreement between the parties. We held that claimant had completed its prima facie case when there was admitted into evidence a balance sheet prepared by Alexander Grant containing an appropriate recitation of compliance with the language of the agreement.

## II. REMEDY FOR BREACH OF WARRANTY.

■ It is the position of claimant that the agreement provides alternate bases for it to recover, first, an action pursuant to para. 5(a) of the agreement for breach of warranty, and second, suit under para. 5(c) of the agreement for price adjustment based upon a post closing audit by Alexander Grant & Company. Debtor, to the contrary, says that only the second alternative is available to claimant. We conclude that a proper interpretation of the agreement permits recovery only under the second stated alternative.

It is true that para. 4 of the agreement, entitled Warranties And Undertakings of Seller, contains subparagraphs typical of an agreement in an acquisition of a business, boiler plate, but it also contains subparagraphs directed at matters specific to the transaction of the acquisition of KDI Hagen by Hagen Sign. For instance, subparagraph (f) warrants the accounts receivable as recited on Exhibit B attached to the agreement, and subparagraph (g) warrants current and usable inventories as shown on Exhibit B.

Para. 5 of the agreement is entitled, Indemnity—Accounts Receivable. Subparagraph (a) thereunder recites that seller

"will indemnify and hold harmless the Purchaser from and against any breach of any warranty, or inaccurate or erroneous representation of Seller contained in the Agreement, or in any Exhibit, Appendix, Certificate, or other instrument delivered pursuant hereto (hereinafter, all and singular, referred to as "losses"), and any expenses of Purchaser arising from or caused by said losses. Losses aggregating less than $4,000.00 shall not be taken into account."

Notwithstanding the title of para. 5, 5(a) does not deal specifically with the warranty of accounts receivable.

Subparagraph 5(b) deals first with claims of third parties which may give rise to "losses" as defined in the contract language above, and sets up a mechanism whereby seller could participate in the settlement of

any such claim. Furthermore, the subparagraph deals with the accounts receivable of Fotolab Corporation and Dunkin' Donuts, Inc. providing that seller could take over the collection of such accounts receivable. The subparagraph finally defines the obligation of purchaser to pursue these accounts receivable in the absence of efforts by seller to collect them. We note here that no evidence was introduced that the seller did utilize this contract provision in regard to the collection of the Fotolab or Dunkin' Donuts accounts.

We come then to the critical subparagraph 5(c), which we have already quoted above. This subparagraph provides for an audit "of the balance sheet of Seller as of October 31, 1970", and in the event that "such examination reveals a breach of any of the warranties or representations contained in this Agreement, Purchaser shall be entitled to a credit against the purchase price."

Subparagraph 5(d) states the right of purchaser to retain $200,000.00 of the purchase price as "security for the warranties and representations of Seller and, in particular, the warranty that the accounts receivable of Seller are current and collectible, except to the extent of reserve for doubtful accounts of $7,193.00." The paragraph further spells out the rights and obligations of the parties as accounts receivable are collected and the time arrives for payments to seller from the retained $200,000.00 of the purchase price.

Subparagraph 5(e) provides a limitation as to consequences of an audit pursuant to 5(c) which is more favorable to the seller than Exhibit B attached to the agreement.

■ It is an elementary legal proposition that there is no room for extrinsic evidence in the interpretation of a contract, if the terms of the contract are clear and unambiguous. We do not think this contract clear and unambiguous, at least so far as the intention of the parties is concerned, with regard to the remedies available to the purchaser in the event of a breach of the warranties relating to the balance sheet, Exhibit B. If it were the intention of the parties that the purchaser have a remedy by way of an action for breach of contract for breach of the contract warranties, there is no need for subparagraph 5(c), which directly and specifically requires that there be an audit by Alexander Grant, and an adjustment based upon the result of that audit. Resorting to familiar rules of contract construction, we are not justified in assuming that a substantial provision in a contract, clearly deliberately included by the parties, was pointless.

■ Under the circumstances, we are justified in looking at extrinsic evidence to determine the intention of the parties in entering into the agreement. The only evidence in the record on this score is to be found in the testimony of Lloyd Miller. It was his testimony that the deal for the acquisition of KDI Hagen by Hagen Sign was negotiated by himself and by Keith Taylor, Chairman of the Board and Chief Executive Officer of KDI. Only Miller and Taylor were involved in the negotiations leading up to the agreement. Miller testified (May 24, 1979, pp. 316–317):

"I indicated to Keith Taylor that I would not proceed under any circumstances to acquire the sign company, KDI Hagen, without a preacquisition audit. He indicated to me that KDI was in desperate need of money, that without—I mean that a preacquisition audit would take time and that they needed the money now. And so, I had never used Alexander Grant, I was really—I don't know just how the name arose in our conversations except that my accountants have always been local, and during the course of our negotiations, *he said that if I would rely upon a national CPA firm, KDI would warrant all of the assets in the balance sheet of October 31, 1970.*"

From this testimony it is perfectly clear that the parties did intend that there be a relationship between the Alexander Grant audit and any adjustment which might become necessary in the event that the figures warranted in the Exhibit B balance sheet proved to be inaccurate. We conclude that the only remedy available to the claim-

ant pursuant to the agreement for breach of warranty, is that to be found in para. 5(c), and claimant may not have recovery for any breach of warranty except upon the audit which was provided by Alexander Grant.

## III. THE ALEXANDER GRANT RE-PORT.

■■ As we have seen, claimant's only remedy for breach of warranty is pursuant to the audit of Alexander Grant as provided in para. 5(c) of the agreement. Further, as we have earlier stated, claimant has the burden of proof of establishing that the audit of Alexander Grant entitles it to remedy for breach of warranty. In addition, we earlier stated that claimant had made out a prima facie case when it offered the contract as well as the Alexander Grant report. While of course the burden of proof always remains with the claimant as we have held, at this point the burden of persuasion shifted to debtor.

In an effort to meet that burden, debtor took the position, first, that claimant had failed to show that it had met the prerequisite of consistency of para. 5(c) of the agreement, and, second, that independence of the auditor is implied in the requirement of para. 5(c) that the balance sheet be prepared in accordance with "generally accepted accounting principles", and in fact, the auditor, Alexander Grant, was not independent.

In respect to the latter point, independence of the auditor, debtor presented its position primarily on the basis that the auditor was not independent within the requirements of the profession because it requested indemnification from Hagen Sign, and that there is further evidence of a lack of independence to be seen in the way that Alexander Grant dealt with Hagen Sign by contrast to the way it dealt with KDI, as well as in the manner in which the audit was performed with respect to certain specific balance sheet categories such as accounts receivable, inventory, etc.

After carefully considering the various assertions of the debtor, we are not per-

suaded that the requirements of para. 5(c) of the agreement were not met in the balance sheet audit performed by Alexander Grant, and conclude that the claimant is entitled to relief.

*A. Consistency.*

Alexander Grant issued its certified audit report of adjustment to the Exhibit B balance sheet in July, 1971. The report contained a certification that the examination leading to the report had been made "in accordance with generally accepted auditing standards", but expressly included the following statement:

> "We cannot state whether or not these accounting principles have been applied on a basis consistent with that of the company's preceding fiscal periods because records made available to us do not indicate the principles involved in valuing certain items, principally inventories, and we were not permitted by KDI Hagen Corporation to review auditors' working papers for the prior year in an attempt to ascertain the consistency of the application of accounting principles."

Not until the eve of the trial did claimant present a report certified as to consistency. It is to be noted that the report so certified was identical with that to which we have above referred, which was issued in July, 1971. Debtor, in its trial memorandum, analyzes the evidence for the purpose of showing that the appropriate records were available to Alexander Grant as early as 1971, by which it could make a determination as to consistency, and that it failed to do so until the eve of trial. To permit this evidence to be considered at this time, says debtor, is inequitable.

After careful consideration of the. evidence offered at the trial, we have reached the conclusion that the requisite records were not made available by the debtor to Alexander Grant until shortly before the trial and that it was for this reason that Alexander Grant could not until that time issue a certification as to consistency. Because it is debtor that prevented the determination of consistency by Alexander Grant, that performance of this contract

requirement was excused. That position is not necessary under the circumstances of the present case, but applying the same reasoning, we reject the position of debtor that it would be inequitable to except the certification as to consistency because it came so late in the proceedings.

B. *Independence.*

1. The Indemnification.

It is worthwhile here to review the evidence with respect to how Alexander Grant got into the picture, and its role in auditing Hagen Sign. It was Lloyd Miller who was principally interested in purchasing Hagen Sign from KDI. The only ones involved in the negotiation for the acquisition were Miller and Keith Taylor, the chief officer of KDI. The only evidence that we have of that negotiation in the present record is the account by Miller. Miller and Taylor agreed to use Alexander Grant. Miller had not used Alexander Grant prior to the Hagen Sign acquisition. The person at Alexander Grant with whom Miller dealt was Mauch, managing partner of the local office of Alexander Grant. Mauch was first contacted by Miller on December 22, 1970.

On January 21, 1971, Mauch, of Alexander Grant, wrote a letter to Gettler, attorney for Hagen Sign, requesting indemnification for its work in the following language:

"In consideration of Alexander Grant & Company performing an audit of KDI Hagen Corporation in connection with the acquisition of the assets of KDI Hagen Corporation by Hagen Sign Corporation, Hagen Sign Corporation agrees to hold Alexander Grant & Company harmless for any loss it may suffer in connection with the performance of such services.

"Without limiting the generality of the foregoing, such losses shall include law suits (including costs of representation) whether actions are brought by seller or any other party."

Such indemnification was not granted. On August 30, 1971, Miller, on behalf of Hagen Sign, did send Alexander Grant a hold harmless letter in the following language:

"In consideration of Alexander Grant & Company performing an audit of KDI Hagen Corporation in connection with the acquisition of the assets of KDI Hagen Corporation by Hagen Sign Corporation, Hagen Sign Corporation agrees to hold Alexander Grant & Company harmless for any loss it may suffer in connection with the performance of such services, except losses caused by negligence or other fault of employees or agents of Alexander Grant & Company.

"Without limiting the generality of the foregoing, such losses shall include law suits (including costs of representation) whether actions are brought by seller or any other party. (Deb. Ex. 2)."

Notice of the hold harmless requests and agreement was not given to KDI Hagen or KDI Corporation by either Hagen Sign or Alexander Grant.

A status report, the Schedule of Adjustments, and the audit report itself were sent to Gettler, and not to KDI as well. The record is clear that Alexander Grant was paid for its services in connection with the audit by Hagen Sign after it was acquired by Miller. While there was the predictable sharp disagreement between the experts of debtor and those of claimant with regard to whether the request for indemnification and the grant of indemnification to Alexander Grant by Hagen Sign compromised the independence of Alexander Grant, there was no dispute among the experts that payment of a fee to a C.P.A. by a client who audits the affairs of that client, does not compromise the independence of the auditor.

There is nothing in the contract between KDI Hagen and Hagen Sign which addresses the relationship which Alexander Grant was to have with the purchaser and seller respectively subsequent to the execution of the agreement. What, in fact, happened subsequent to that event was that Hagen Sign, under Miller, dealt with Alexander Grant as its client. Miller retained the services of Alexander Grant to perform the audit, and his company paid the bill of

Alexander Grant for the audit. Alexander Grant corresponded with Hagen Sign, Miller, and Gettler in the normal way that a C.P.A. firm deals with its client. There is nothing in the record to suggest that this was not what the parties had intended. Specifically, there is no suggestion that KDI Hagen paid, or was to pay, any part of the bill of Alexander Grant, or objected to such payment by the purchaser. We, therefore, reject the suggestions of the debtor throughout the trial of this matter that this course of dealing between Hagen Sign and Alexander Grant, without involving KDI, was improper, was a violation of the agreement, or constituted conduct prejudicial to KDI. If we focus on the more specific complaint of debtor, that the request for and grant of indemnity to Alexander Grant by the purchaser betrayed the requirement that an auditor be independent, we likewise reject that contention of the debtor. It is true that independence is a requirement of the standards of the profession of certified public accountant. While sec. 52 of the written standards only became effective March 7, 1973, subsequent to the events with which we are here concerned, independence was a professional requirement even prior to that date, provided for in Article 1 of the Code of Professional Ethics of the American Institute of Certified Public Accountants.

Article 1.01 thereof in pertinent part provided:

"Neither a member or associate, nor a firm of which he is a partner, shall express an opinion on financial statements of any enterprise unless he and his firm are in fact independent with respect to such enterprise."

\* \* \* \* \* \*

"A member or associate will be considered not independent, for example, with respect to any enterprise if he, or one of his partners, (a) during the period of his professional engagement or at the time of expressing his opinion, had, or was committed to acquire, any direct financial interest or material indirect financial interest in the enterprise, or (b) during the period of his professional engagement, at the time of expressing his opinion or during the period covered by the financial statements, was connected with the enterprise as a promoter, underwriter, voting trustee, director, officer of key employee."

\* \* \* \* \* \*

We hold that neither the request for indemnity nor the indemnity later granted was a "financial interest", nor connection within the contemplation of this provision. As testified to by Christenson in reference to this language:

"Basically, it refers to owning stock, participating in profit sharing plans and so forth with a company."

Protection against the expense of involvement in a law suit is not of this character, but is no more than a prudent person would seek so that his fee not be consumed in collateral effort for the client.

The testimony of debtor's experts, Phillips and Wertheimer, that Alexander Grant was not independent, is flawed, in our judgment, by both their statements that indemnity is not permissible because it gives a financial interest in the client. As we have stated, this is simply not valid when one admits, as does Wertheimer, that independent auditors are paid by their clients and such fees do not affect their independence. We note also the testimony by Phillips that others might interpret sec. 52 differently from him. We find the contention of the debtor and its experts illogical, that the grant of indemnity, or even a request for indemnity, means that the one indemnified has a financial interest in the indemnitor because without a solvent client the indemnification is without value. That ground for contending that indemnification compromises independence is clearly unsound. Exactly the same thing could be said as to the interest of an accountant in the continuing solvency of its client so that its fee may be paid, but no one suggests that looking to the client for a fee compromises independence. We found the testimony of Christenson, creditor's accountant expert, persuasive, particularly in his testimony

that the request for indemnity was no more than looking to Hagen Sign for its fee.

A fact in the evidence which powerfully confirms independence of Alexander Grant in connection with the audit was the refusal of Alexander Grant initially to certify the consistency of its audit. Clearly, this action was inconvenient for its client, Hagen Sign. Yet, the evidence was that not until Alexander Grant was given access to documents upon which it could base a judgment of consistency, did it certify that requirement.

2. Elements of the Audit.

 In addition to the challenge to independence by reason of the indemnification, it is the further position of the debtor that the way in which they performed is evidence of a lack of independence, because it was done to favor the purchaser. We must, therefore, examine the evidence which goes to the validity of the audit. Before doing so, however, we must deal with the position of the creditor that such a consideration is unnecessary, because the parties are estopped to question the audit if the audit was in accordance with generally accepted accounting principals applied on a basis consistent with that of seller's preceding fiscal periods, because that is all that the parties bargained for. While our acceptance of this position would make the task of the court easier, it has to be rejected, because if the audit was dishonest, it cannot stand. We turn, therefore, to the arguments of debtor directed at the audit itself.

These fall into four (4) categories: (a) Improper Influence by Attorney, (b) Treatment of Bad Debt Reserve, (c) Five Separate Items in the Inventory Audit, and (d) Contingent Income Tax Liability. Debtor's position on all of these matters primarily depends upon the testimony of Carol Wright, a certified public accountant employed by debtor, and the testimony of Thomas R. Ketteler, the certified public accountant, in 1971 an employee of, now a partner in, the accounting firm of Alexander Grant & Company. He was in charge of the audit of Hagen Sign for Alexander Grant and was called as a witness by claimant. We have reviewed this evidence with

particular care in preparation for the following discussion.

(a) Improper Influence by Attorney. The facts involved here are not in dispute. Ketteler and Abs, of Alexander Grant, met with Ben Gettler, attorney for claimant, in February or March of 1971. For that meeting, a written status report had been prepared by Alexander Grant. KDI had not been invited to attend the meeting. The status report showed a price adjustment in favor of claimant of $324,020.00. The final Schedule of Adjustments issued by Alexander Grant sometime in the latter part of March, 1971, increased the price adjustment to $479,569.00.

During the audit process, in January or February of 1971, Alexander Grant wrote off old outstanding checks because the checks were more than a year old. Because Gettler told the auditors that liability would exist if the checks involved were later presented for payment, a $1,381.00 item was removed from that write off. The largest part of the $1,381.00, a check for $1,205.00, was made out to Dunkin' Donuts, a major customer with whom the client continued to do business. All of the foregoing, debtor contends, provides evidence that Alexander Grant was not independent, but in fact was influenced by, and biased in favor of, claimant.

We cannot attach to this evidence the significance given it by debtor. As we stated earlier, Hagen Sign stood in the relationship of client to Alexander Grant because it was paying the bills. KDI was not in this position, and so we will not attach any adverse inference to the fact that KDI was not invited to the meeting to discuss the status of the audit.

Further, we cannot conclude that Alexander Grant was improperly influenced by claimant from the fact that it reversed a $1,381.00 item "per Ben Gettler." The change in position of the auditor was independently justifiable because the major portion of the item was attributable to a check outstanding to a major customer. This factor was not taken into account at the time that the write off was first included in the

audit, for the indication is that the write off originally was made routinely simply because the checks were over one year old. In addition, we note the scrupulousness of Alexander Grant in noting the incident in its work papers, and have no doubt that like notations would have been made had there been other interventions by Gettler. In view of the small amount involved in this incident, which was the only one of its kind, together with the fact that it has independent justification, we cannot find that the incident evidences a mental attitude favorable to buyer and prejudicial to seller.

(b) Treatment of Bad Debt Reserve. The evidence on this item begins with the balance sheet, Exhibit B, attached to the agreement between the parties, JX–3. Therein accounts receivable are stated to by $703,215.00. This figure is net after a reserve for doubtful accounts of $7,193.00, according to para. 4(f) of the agreement.

As of March 17, 1971, in the course of its audit, Alexander Grant had noted that an appropriate reserve for bad debts was $20,-000.00. Alexander Grant did not finalize its figure for that reserve until July 20, 1971, and at that time they increased the reserve to $43,673.00. Wright thought it "rather lengthy" to have the audit go for nine months beyond the audit date of October 31, 1970, and Ketteler's view was in accord. In its adjustment pursuant to its audit, Alexander Grant concluded that accounts receivable were $651,390.00, the allowance for doubtful receivables was $43,673.00, giving a net figure for accounts receivable of $607,717.00.

Highly relevant on the present question is the testimony of James Keller, who became controller of KDI Hagen in August, 1970. He prepared the balance sheet for October 31, 1970, Exhibit B attached to JX–3. In preparing Exhibit B, because he was so new to the company, he "could only follow what had been done in the past, classifications of accounts and so forth." Subsequent to preparing Exhibit B, Keller learned that many receivable items carried on the books were not valid. As a result of his efforts in verifying which were valid, he determined

that the amount of valid accounts receivable on the books as of October 31, 1970, was $651,391.00. The total amount of accounts receivable that was ultimately collected was $584,718.00. Because of the need for cash in the company, Miller spurred the personnel of Hagen Sign, Driggers, Keller, and McLanghlin to extensive efforts to collect the accounts.

Further on the subject of accounts receivable and bad debts, it should be noted that the contract between the parties contained not only the warranty of accounts receivable, but also the following at para. 5(b):

" . . . If after six (6) months from the date of closing, Purchaser has not collected in full the accounts receivable due as of the date of closing from Photofab Corporation and Dunkin Donuts, Inc., then and in that event Seller shall have the right, if it so elects, to take over and direct the efforts to make such collection . . . "

There is no evidence that KDI, following the sale of Hagen Sign, invoked this provision or made any effort to participate in collection of accounts receivable.

In this area of accounts receivable and reserve for bad debts, debtor asserts improper conduct by Alexander Grant in that its method for calculating the reserve is questionable. In addition, increasing the reserve by $23,673.00 in July, 1971, was "unusual in that an audit does not normally continue for so long a period."

The inferences which debtor suggests should be drawn from the presently relevant facts are in our judgment not justifiable. The overriding fact which leads us to this conclusion is that despite extensive efforts to collect the accounts receivable, only $584,718.00 was ultimately collected. The audit figure of $607,717.00, and the $3,673.00 reserve figure, which was applied to derive that figure, therefore, cannot be regarded as improper, for the purpose of an audit as to accounts receivable is to approach reality as closely as possible. The evidence leaves us persuaded that the warranted figure for accounts receivable in Exhibit B, $703,215.00, was grossly overstated.

Debtor is in no position to question that $584,718.00 is the maximum amount that could be recovered on the accounts receivable, for it either could have, or actually did, provide by contract means for itself to control collections. To the extent that it did so provide, it never utilized its contract right.

Nor are we able to attach any significance to the fact that the audit was held open as to accounts receivable for an unusually long time. While concededly unusual, there is no indication that this transgressed appropriate standards, and was not necessary in view of the problems of determining questions of validity of accounts receivable which continued long after March 15, 1971, the date by which debtor suggests that the bad debt reserve and accounts receivable figures should have been finalized.

(c) Five Inventory Items. The attack on inventory by debtor falls into the following categories: (i) Raw material—steel, (ii) the $9.00 labor rate, (iii) finished goods, (iv) wired housings, and (v) Fotomat inventory. Before looking at these items individually, we make reference to one important fact which is not in dispute. That is that the figure for inventories appearing in Exhibit B was not based upon an actual inventory count, but was derived by what is known as the gross profit method. The gross profit method for valuing inventory is based entirely upon computation. It involves taking the inventory at the beginning of the period under consideration, adding to that the items going into inventory during the period, which would consist of material, labor, and overhead, and deducting from that items coming out of inventory, that is, sales. It is not gross sales which are deducted, but so much of gross sales as is thought to reflect the cost portion of the sales figure. The gross profit method is far from a precise way of deriving an inventory figure, and it is used internally by companies to close their monthly books, for in this connection an approximate figure is adequate.

By contrast to the gross profit method utilized in deriving inventories on Exhibit B, Alexander Grant, in its audit pursuant to the agreement, took a physical inventory, that is, the items in inventory were counted and valued. In accounting practice it is conventional to take samples where there are many identical items in inventory, and extend the valuation of the samples to the entire inventory of those items. The practice is to value the samples and if that valuation is reasonably close to that of the value being carried by the company being audited, it is not necessary to go further. If, however, the value of the sample departs by a significant percentage from the valuation being carried, a large departure therefrom discredits the carried valuation, and it may be necessary to count the entire inventory in order to get an accurate valuation. We note at this point that of course it is not directly the number of items themselves which are presently of concern, but rather the value of those items for inventory purposes that is of concern. Thus, the sampling process has to do not just with counting items, but also with valuing them. We must also remark at this point that the valuation method permissible for the audit was cost or market.

(i) Raw Material—Steel. A sampling process for steel inventory was employed in the manner above described. Debtor takes particular exception to the fact that after initial sampling utilizing available invoices, a fourteen percent error was found, i. e. departure from company's valuation, yet the sample was not extended. Ketteler, the Alexander Grant accountant in charge of the audit, explained the fact that the sample was not extended. He said that it was subsequently discovered that the company's valuation had involved the use of a price list for the wrong year, and this satisfied him that the company's figure was unreliable, and an adjustment could be made on the basis of his sample.

Bearing in mind that what is before the finder of fact at this point is not the actual value of inventory of the company, but rather whether the auditing procedures utilized by Alexander Grant indicated a manipulation of the process for the benefit of claimant, thereby betraying an absence of

independence, we are simply not persuaded that this is so. While debtor questions the judgment and procedure of Alexander Grant in what it did, we do not see a basis for question. It seems to us well within the bounds of acceptable judgment for Alexander Grant to have valued the steel inventory based upon its sampling when it discovered that the reason for the variance from the company's value was a basic error in arriving at the valuation used by the company. For Alexander Grant not to apply the general procedure of extending its sample in these circumstances is entirely reasonable. In these circumstances, we are unpersuaded that there was any bias in favor of purchaser displayed by Alexander Grant in its valuation procedures for the steel inventory.

(ii) The $9.00 Labor Rate. Keller, who had been controller of KDI Hagen, testified that a $9.00 labor rate was used in arriving at the company's inventory valuation, and reference to this figure was also made by Ketteler. In its post trial memorandum, debtor questions the accuracy of this testimony. Again, it must be borne in mind that debtor makes this reference for the purpose of showing improper bias. On this point we have concluded that the complaint of debtor simply has no point for our present consideration. There is no question that a $9.00 labor rate was not used by Alexander Grant in its inventory valuation, and just what labor was used in the inventory valuation appearing in Exhibit B would appear not to be of great moment, bearing in mind that the inventory figure in Exhibit B was derived by the gross profit method and not by a physical inventory. No reason has been advanced by debtor which raises the possibility in our judgment that the Alexander Grant inventory figure results from a biased judgment because an incorrect labor figure may or may not have been used in some connection not here relevant.

We note at this point that debtor, in its memoranda, on several occasions comments upon the fact that Ketteler, the Alexander Grant auditor, testified from recollection and not from work papers. The inference in the comment is that the auditing process is suspect because the work papers do not contain the information, statement of basis for exercise of Ketteler's judgment, to which he testified. On this record we reject this contention of debtor. We are unaware of any evidence, by expert testimony or otherwise, that the basis for reaching a judgment in the audit should be recorded in work papers, and this conclusion is certainly not self evident.

(iii) Finished Goods. In connection with an indoor sign category of finished goods, Wright determined that Alexander Grant tested about 11% and found a 29.4% error rate on the basis of which they came up with a $20,000.00 adjustment. In connection with another item, Standard Oil signs they tested $3,000.00 out of a $15,000.00 inventory and also came up with a 29.4% error rate. Debtor does not comment in its memorandum and presumably has no objection to the adjustment downward for outdoor signs where approximately 50% of the inventory was tested and an error rate of 13.5% was ascertained.

We think it important to note that debtor's objection to the adjustment of the indoor sign items depends on the testimony of Carol Wright, whose testimony was:

> " . . . I'm merely saying that had I been under similar circumstances, I probably would have expanded my test to a little bit more."

Not present in her testimony or anywhere else is there any statement that what Alexander Grant did in this situation does not accord with generally accepted accounting principles, or that the result arrived at by Alexander Grant was inaccurate. With all due respect to Wright, the parties contracted for an audit by Alexander Grant, not one by Wright.

(iv) Wired Housings. This subject is dealt with by debtor in extended sections of the trial record, and by very detailed exposition in trial memoranda. The essence of debtor's position, however, is not complex. In the audit Alexander Grant dealt with work-in-process wired housings, and fin-

ished wired housings separately. In adjusting work-in-process wired housings Alexander Grant made a 15.8% reduction. In adjusting finished wired housings they made a 17.3% reduction.

Debtor has no objection to the 15.8% factor applied to work-in-process wired housings, but urges that the 17.3% figure cannot be correct because all labor for wired housings was included in the work-in-process figures, and since only labor accounts for the adjustment with respect to wired housings, then for the finished items, the percent adjustment should be less than 15.8%, not more.

An explanation for the different treatment of the two categories of wired housings was furnished by Ketteler. He testified that it was the client who had separately classified the second category. Alexander Grant concluded that the items in this category were finished items. As a result, Alexander Grant applied to this category an adjustment based upon the overall overpricing in the finished goods inventory. For the work-in-process wired housings, it was necessary for Alexander Grant to go through various calculations, particularly for that item to determine an adjustment figure. It was Ketteler's view that the two wired housing items "are not comparable."

This explanation of the treatment of the two items in different manner by Alexander Grant is entirely reasonable. There is no evidence that it is not in accord with generally accepted accounting principles, and in this instance it is appropriate to comment that the parties bargained for an audit by Alexander Grant, not one by counsel.

(v) Fotomat Inventory. Here, debtor objects to the write-off by Alexander Grant of an item of $34,718.00 for letters spelling the trade name Fotomat which had been purchased from a firm called Florida Plastics. In February, 1971, in the course of its audit, Alexander Grant was carrying the Fotomat inventory as an item of value because its information from its client was that the letters could be returned less a 5% write down for handling charges. The client informed Alexander Grant in July, however, that the item could not be returned, and Alexander Grant, thereupon, wrote off the entire value, $34,718.00.

The order for these letters had been issued prior to January 1, 1970, KDI Hagen or its predecessor having an understanding with the Fotomat company for the purchase of the letters. Leonard Hagen, who had owned the Hagen Sign firm prior to its acquisition by KDI, released Fotomat from its obligation to purchase, and because of that the Fotomat letters on October 31, 1970, were not current and usable inventory of KDI Hagen. Then, in December, 1970, and later, there was correspondence between KDI Hagen and Florida Plastics. That correspondence indicated that in December, 1970, and as late as January or February, 1971, the letters could have been returned to Florida Plastics for credit, but the opportunity for this was withdrawn in July, 1971. Alexander Grant, upon being informed of this, thereupon wrote off the Fotomat letter inventory in its entirety. It is the position of the debtor that this adjustment by Alexander Grant was improper, because, asserts debtor, the Fotomat inventory had value on October 31, 1970, the audit date required by the contract between the parties.

We had thought that the question was simply, did this inventory have value on October 31, 1970, and the answer to that is clear so far as the record here is concerned. The only evidence is that it did not.

But the parties have called our attention to Auditing Standard para. 560, which deals with how an auditor should deal with information as to events subsequent to the balance sheet date. Under certain circumstances such events should lead to adjustments, while under others, they should not. Debtor's argument that the Fotomat inventory should not have been written off because they could have been returned in December, January, or February, 1971, is not persuasive, for if events at that time are to be taken into consideration, there is no reason why relevant events in July, 1971, should not also be considered.

In any event, debtor's complaint here is not really with the auditing firm, but with Hagen Sign, and that complaint is summed up in debtor's words in its memorandum, that the failure to return the inventory was "an indication of business incompetence". We perceive no improper conduct by Alexander Grant in connection with this item. It merely reflected accurately in its audit process business events which were occurring, and the write off of the Fotomat letters was a rational judgment by the auditor.

(d) Contingent Income Tax Liability. In the Schedule of Adjustments issued by Alexander Grant, under the heading "Contingencies" appears an item of $51,338.00 for an IRS claim for 1969 Federal income tax liability. In fact, KDI paid this tax on January 27, 1971. Ketteler, of Alexander Grant, testified that the item was included as a contingency because he did not know it had been paid, and because he understood that "KDI was in bankruptcy and that a claim for income taxes would follow the assets." He talked to Keller (controller of KDI Hagen and Hagen Sign) about whether the bill had been paid.

Debtor contends that inclusion of this item is evidence of bias, for, debtor says in its memorandum, Alexander Grant should have undertaken "minimal verification procedures (contact IRS)".

In the absence of evidence that generally accepted accounting principles require that an auditor go further than Alexander Grant did in respect to this item we reject the suggestion that there was anything improper in its procedure as to this item. Indeed, we find the assertion to this effect by debtor bordering on the frivolous in view of the clear fact that the item was stated as a contingency and not as an adjustment.

\* \* \* \* \* \*

While we have above considered individually the items advanced by debtor as evidence of bias against it by Alexander Grant in connection with its audit, a comment on them collectively is in order. Particularly is this so because debtor suggests that the cumulative effect of all of them is suggestive of impropriety in the conduct of the audit. We cannot agree.

To the contrary, we notice that for a number of the items, debtor does not contest that some adjustment in favor of claimant is justified. It contests only the amount of that adjustment. This is true as to accounts receivable, the steel inventory, indoor sign inventory, and wired housing inventory. This reinforces our rejection of debtor's often repeated position that adjustments favoring claimant are evidence of bias in favor of claimant. We can find no impropriety in the actions of Alexander Grant in conducting its audit.

Indeed, our review of the evidence persuades us that the reason for the adjustments in favor of claimant was that the balance sheet in the agreement, Exhibit B, was inaccurate, heavily so in favor of the seller. This perhaps was not by the design of the seller, for that balance sheet was not prepared in connection with the sale. Instead it was prepared for internal purposes by the gross profit method by Keller, then a new employee of KDI Hagen. No thought was given in its preparation to following generally accepted accounting principles. Accounting procedures at the company at that time were primitive, and there were little or no controls. Under these circumstances it was perhaps inevitable that Exhibit B would turn out on an audit to be highly inaccurate.

In addition, in making this comment to the several items collectively, we reiterate a point we have made elsewhere. The criticisms levelled by debtor are for the most part based on the testimony of Carol Wright, an accountant employed full-time by KDI. She was assigned the task by her employer just before trial of reviewing the Alexander Grant audit with such work papers as her employee furnished. It was clearly stated in her testimony that she was expressing her own opinions. Indeed, in regard to what properly should be included in overhead in a balance sheet, she said:

"It's a question you give three different accountants the same trial balance and you very possibly could come up with

variations as to what would be specifically in overhead for that particular company at that particular point in time." This statement illustrates her scrupulousness in fairly presenting the proper scope of her testimony. She never stated that actions of Alexander Grant to which she took exception violated the standard which had been contracted for, the standard of meeting generally accepted accounting principles.

But the parties did not contract for an audit by Carol Wright. They contracted for one by Alexander Grant, conducted in accordance with generally accepted accounting principles applied on a basis consistent with that of seller's preceding fiscal periods. Neither Wright nor either of the outside accounting experts called by debtor at the trial testified that the Alexander Grant balance sheet or Schedule of Adjustments or procedures utilized in deriving item, in any way failed to meet these standards. The only expert testimony on the subject, that of Christenson, was that the Alexander Grant audit did conform with generally accepted accounting principles. We reject debtor's position that the Alexander Grant audit was conducted in a manner prejudicial to debtor.

IV. ATTORNEY'S AND ACCOUNTANT'S FEES.

As part of its claim in this case, claimant asserts that it is entitled to recover its attorney's fees and accountant's fees incurred in connection with prosecution of the present claim. The evidence presented by claimant with regard to attorney's fees was that the law firm of Gettler and Katz had been retained on a contingency fee basis providing for a recovery of one-third of any judgment obtained, up to a maximum of $50,000.00. In view of the fact that claimant's further evidence showed that counsel had spent 564 hours prior to trial, we hold that $50,000.00 is a reasonable attorney's fee. In addition, the evidence supports the contention of claimant that accountant's fees of Alexander Grant for services in connection with prosecution of the present

claim have the reasonable value of $20,-811.50. Finally, we hold that the reasonable value of claimant's accounting expert, Christenson, based upon the evidence, was $7,500.00 for services in connection with his testimony and preparation therefor. We turn, then to the question of whether claimant is entitled to recover these amounts from the debtor.

It is fundamental that one may not recover his litigation expenses in the absence of a contractual or statutory provision providing for such recovery. Certainly this is the "American Rule" regarding attorney's fees. See *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). But, where a contract between the litigants provides otherwise, such contracts are valid and are given effect. 17 Am.Jur.2d Contracts sec. 164. It is the position of claimant in the case before us that the contract between the parties does provide that claimant shall be entitled to recover its expenses of litigation in this suit, claimant for this purpose directing our attention to para. 5(a) of the agreement between the parties which provides as follows:

"Notwithstanding any investigation of the business and assets of seller made by or on behalf of purchaser prior to the closing, seller will indemnify and hold harmless the purchaser from and against any breach of warranty, or inaccurate or erroneous representation of seller contained in the agreement, certificate, or other instrument delivered pursuant hereto (hereinafter all and singular referred to as "Losses"), and any expense of purchaser arising from or caused by said losses. Losses aggregating less than $4,000.00 shall not be taken into account."

It is the clause "and any expense of purchaser arising from or caused by said losses" where *breach of warranty is defined in the contractual provision as a "loss",* upon which purchaser relies to support its contention.

We conclude that claimant is not entitled to recover its litigation expenses, either attorney's or accountant's, because it

is our understanding that courts in applying the general principles to which we have referred above, require that the contract language be express and specific with regard to such items. See *Washington Aluminum Co. v. Pittman Construction Co.,* 383 F.2d 798 (5th Cir. 1967); *Federal Surety Co. v. Basin Construction Co.,* 91 Mont. 114, 5 P.2d 775 (1931); *Alexander v. Fidelity & Casualty Co.,* 232 Miss. 629, 100 So.2d 347 (Miss.1958). An illustration of the kind of language which will suffice so that attorney's fees may be recovered is to be found in *Thibodeaux v. Texas Eastern Transmission Corp.,* 548 F.2d 581 (5th Cir. 1977) where the indemnity contract expressly provided for payment of "all damages, losses, costs and expenses, including reasonable attorneys' fees incurred . . .". Not finding adequate contract language to evidence an intention of the parties that the cost of litigation can be recovered, claimant's claim for reimbursement of such items is denied.

## V. TIMELINESS.

Finally, debtor asserts two positions regarding timeliness, that claimant's amended claim was not timely filed, and that claimant did not file its claim within the one year of closing provided in the contract as the time for which warranties were to survive. Both these positions are mooted by what appears earlier herein. The amendment to the claim was to include attorney's and accountant's fees which we have held not allowable. As to the other item, we have held that claimant can recover only under para. 5(c) of the agreement and not on an independent claim for breach of warranty. To the extent that the one year contract period is here relevant, a matter which we do not decide, it is therefore mooted.

## VI. CONCLUSION.

Claimant's claim will be allowed in the amount of $256,154.00. This is the net adjustment shown in the Alexander Grant Schedule of Adjustments, $513,747.00, reduced by the amount of the IRS contingency $53,593.00 or $460,154.00. This figure is reduced again by the $200,000.00 withheld

by buyer according to the contract, and $4,000.00 as provided in para. 5(a) of the contract.

All of the foregoing shall constitute our findings of fact and conclusions of law.