**In re BERNHARD STEINER PIANOS USA, INC., Debtor.**

**No. 02–32294–HDH–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Dec. 17, 2002.

110

Larry R. Boyd, Abernathy, Roeder, Boyd & Joplin, McKinney, TX, for Traci Unger.

Kay D. Brock, Assistant Attorney General, Austin, TX, for Texas Comptroller of Public Accounts.

Robert T. Brousseau, Stutzman & Bromberg, Dallas, TX, for Bombardier Capital Inc.

Kevin J. Franta, Hughes & Luce, Austin, TX, for Dell Financial Services, L.P.

Barbara K. Hamilton, Becket & Lee, Malvern, PA, for American Express Travel Related Svc. Co.

Charles Brackett Hendricks, Cavazos, Hendricks & Poirot, P.C., Dallas, TX, for Nirtag USA, Inc.

Eric A. Liepins, Dallas, TX, for Bernhard Steiner Pianos USA, Inc.

Richard A. McKinney, Higier, Lautin, Foxman, et al., Addison, TX, for Legacy Bank of Texas.

C. Patrick Nunley, Naman, Howell, Smith & Lee, Waco, TX, for Textron Financial Corporation.

John Jack James O'Boyle, Jr., Jack O'Boyle & Associates, Dallas, TX, for Bank of America, N.A.

Veronica Joan Pillay, J. Ward Holliday & Associates, Dallas, TX, for Wells Fargo Auto Finance, Inc.

Paula K. Tucker, Gardere, Wynne & Sewell, Dallas, TX, for Peter Egan.

Lance J. Vander Linden, Brice, Vander Linden & Wernick, Dallas, TX, for Bank One, NA.

Michael K. Vrana, MacDonald, Schuble & Artz, Allen, TX, for Transamerica Commercial Finance Corp.

Elizabeth Weller, Linebarger, Goggan, Blair & et al., Dallas, TX, for Dallas County.

### MEMORANDUM OPINION

HARLIN D. HALE, Bankruptcy Judge.

This opinion addresses two issues which appear frequently in a contested confirmation hearing: classification of claims and plan provisions which affect third party liability. Although this case is not of national importance, it is very important to the parties involved. In addition, because these issues arise frequently in Chapter 11 cases, the Court issues this memorandum opinion.[1]

Finding that the separate classification of consignment creditors from general unsecured creditors and the issuance of a limited stay and tolling provision against pursuing an important insider/guarantor to be permissible, the Court overrules the objections and confirms the plan.

## I. EVENTS LEADING UP TO THE PLAN

Bernhard Steiner Pianos was established in Europe in 1886. In 1903, the company moved operations to South Africa. Bernhard Steiner Pianos was a part of the Kahn Pianos Group, a family business owned by the Kahn family. The Kahn family enjoys an international reputation in the piano industry, with Ivan Kahn being the fourth generation of piano makers in the family.

In 1976, Ivan Kahn and members of his family relocated to the United States and established Bernhard Steiner Pianos USA, Inc. ("Debtor") in North Dallas. The company deals in the sale and service of new and used pianos of all descriptions. The company sells new pianos, consigns used pianos, and repairs and refurbishes pianos. By 2001, annual sales had reached over $3.3 million.

Unfortunately, the Kahn family also entered into other areas of commerce in Africa. Ivan Kahn's father and mother contracted with the Nigerian government

---

1. This opinion contains the Court's supplemental findings of fact and conclusions of law to those made on the record on November 20, 2002, pursuant to Bankruptcy Rule 7052. At the confirmation hearing, the Court compli- mented all counsel for their efforts in resolution of many issues prior to the hearing, and on the way they handled the confirmation hearing.

relating to certain construction. The Kahn family was to provide services and the Nigerian government would then submit payment for those services. Apparently, after some political upheaval in Nigeria, the new government refused to pay the debts of the old government. Much time, energy, and money has been spent by the Kahn family to remedy that situation.

Ivan Kahn was told that some $30 million had been set aside for payment of his family's debt (the "Nigerian Funds"). The Kahn family pursued the Nigerian government for recovery under the contracts, but eventually depleted their funds in this pursuit. Mr. Kahn began assisting his family in recovering the Nigerian Funds, both through his financial support and by his efforts in contacting various parties on behalf of his family. Kahn eventually depleted his own funds.

In order to free up some capital to pursue the Nigerian Funds, the Debtor began to finance some of its pianos. The Debtor found financing through Bombardier Capital ("Bombardier"), Textron Financial Corporation ("Textron"), and Transamerica Commercial Finance Corporation ("Transamerica") (collectively, the "Objecting Creditors"). These lenders provided pianos to the company on a floor plan basis, *i.e.*, the pianos were brought into the store and once a piano was sold, the funds received were used to pay the floor planner for that particular piano. Kahn provided individual guarantees to these lenders.

In a self-described "misguided" attempt to aid his family, Kahn began borrowing funds from the Debtor without repaying on a timely basis, if at all. To further compound the situation, the events of September 11, 2001 were far-reaching and even impacted negatively a piano store in Dallas, Texas. After the terrorist attacks, piano sales fell dramatically for Mr. Kahn. In late 2001 and early 2002, sales were also dismal. Due to the Debtor's cash crunch, funds were not turned over to the lenders providing the floor plan financing. The collateral for the floor plan lenders was exceeded by the debt owed to those entities. Debtor, and Kahn, found themselves out of trust with the floor plan lenders.[2]

Debtor filed this bankruptcy proceeding on March 14, 2002. Debtor remained open for business during the pendency of this bankruptcy. Early in the case, the Objecting Creditors obtained relief from the automatic stay, and repossessed their remaining collateral.

During this bankruptcy case, Debtor entered into a Court-approved agreement with a third party whereby the third party would provide pianos to Debtor and would also pay for the cost of operations for a 90 day period. In return, Debtor and the third party split the profits from the sale. During this 90 day period, Debtor sold $1 million worth of pianos and netted $45,000. Thereafter, Debtor entered into another Court-approved agreement with another third party who presently provides pianos to Debtor for sale.

Debtor filed its Debtor's Plan of Reorganization dated September 13, 2002 (the "Plan"). The Plan contemplates repayment of Debtor's creditors on a 100% basis. Kahn testified that in order for Debtor to repay its creditors, Debtor must maintain a successful operation. Kahn further testified that Debtor's ability to continue successfully in business will require that the Debtor attract good consignment pianos; the sale of new pianos alone will not suffice.

---

2. Although the Court has approved the Plan, such approval does not extend to the unauthorized use of cash collateral of the Objecting Creditors.

Typically, consignment pianos come from individual owners. Most of the consignment business is by word of mouth. In the piano industry, if a consignee gets the reputation that it is unwilling or unable to pay consignors, the consignee won't be able to attract good consignment pianos. Kahn testified that it would be very difficult to supplement any lost consignment income through other operations. Kahn testified that the quicker the Debtor repays the consignment class, the quicker they will get new consignment pianos.

Kahn testified that he will remain the president of the company after confirmation. Largely speaking, Mr. Kahn is all that is left of the Debtor. The company's only tangible assets are some desks and some old wood. At the confirmation hearing, the parties were complimentary of Mr. Kahn's heroic efforts at keeping the Debtor in operation. Through his management during the pendency of the bankruptcy, Kahn singlehandedly managed to keep the Debtor's doors open. The Bernhard Steiner Pianos name is closely associated with Kahn and the Kahn family in the minds of the piano-buying public. The public identifies the Debtor and Mr. Kahn as one and the same.

The Plan was ultimately approved by all the impaired classes except for Class 6, of which the Objecting Creditors, the floor plan lenders, are members.

## II. ANALYSIS

### A. Separate Classification of Certain Unsecured Creditors

The Plan separately classifies creditors whose claims arose from consigned goods and general unsecured claims, including the claims of the floor plan lenders. The floor plan lenders object to this separate classification. Both classes are unsecured creditors.

The consignment creditors, Class 4, will be repaid over a term of 10 months beginning on the effective date of the plan. The floor plan lenders are part of the allowed general unsecured class, Class 6. Under the Plan, as originally drafted, their scheduled payments begin after full payment to Class 4 (and the convenience class, Class 5), approximately one year after the effective date. Under an agreed modification made in Court after the effective date, the Class 6 creditors will also begin to receive a portion of excess cash flow. Based on the record, the excess cash flow payments should begin before the Class 4 consignment claims are paid in full. Despite the favorable change in the payment schedule, the Objecting Creditors still object and argue that both Class 4 and Class 6 should be placed in the same class.

■ All unsecured claims outstanding as of the commencement of the case, and claims arising from the rejection of executory contracts or unexpired leases, may be classified together as general unsecured claims. 7 *Collier on Bankruptcy* ¶ 1122.03[4][a] (15th ed. rev.2000). However, the Code does not require that all such claims be placed within a single class. *Id. See also In re U.S. Truck Co., Inc.*, 800 F.2d 581 (6th Cir.1986). Separate classification of some unsecured claims is allowed if the classification scheme is reasonable. 7 *Collier on Bankruptcy* ¶ 1122.03[4][a] (15th ed. rev.2000).

■ The Fifth Circuit has taught that, as a general premise, substantially similar claims, or those which share common priority and rights against the debtor's estate, should be placed in the same class. *Matter of Greystone*, 995 F.2d 1274 (5th Cir.1992), *cert denied*, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992). Small unsecured claims may be classified separately from their larger counterparts if the court so approves for administrative conve-

nience. *Id.* Substantially similar claims are not permitted to be separately classified "in order to gerrymander an affirmative vote on a reorganization plan." *Id.*

Nevertheless, in this Circuit, separate classification is permitted for "good business reasons." *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enterprises, Ltd., II (In re Briscoe Enterprises, Ltd., II),* 994 F.2d 1160, 1167 (5th Cir.1993) (citing *Matter of Greystone,* 995 F.2d 1274 (5th Cir. 1991), *cert denied,* 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992)). In *Briscoe,* the Court found that where a continuing relationship with an unsecured creditor who had a distinct interest in the debtor's business was essential to the continued operations of the debtor, separate classification of that creditor was for a good business reason.

In the present case, the Debtor has met the good business reason test. Selling consigned pianos has historically been an important part of the Debtor's business and is contemplated to be an integral part of the Debtor's future. Debtor presented evidence, which was not rebutted, that its consignment business had suffered significantly since word had leaked out that Debtor did not remit the proceeds from the sale of consigned pianos. Kahn testified that the consignment market is local and small, and adverse local community opinion affected whether pianos would be consigned to the Debtor or to its competitors. Kahn also testified that competitors were informing potential consignors that Debtor had failed to remit the sale proceeds to its past consignors. The undisputed testimony is that the Class 4 consignment creditors were separately classified so as to accelerate repayment to them so Debtor could begin expeditiously to repair its tarnished consignment name in a small market. Improving the consignment public's perception of this Debtor and restoring trust in the Debtor among potential consignors as soon as possible is important to the success of the reorganization overall.

No evidence of gerrymandering was offered at the confirmation hearing. Debtor's principal, Mr. Kahn, testified that the development of future consignment business was necessary to its successful reorganization and accordingly, for the repayment of its creditors. Further, the Plan, on its face, treats the consignment class and the general unsecured class differently. The Debtor has presented a good business reason for the separate classification and treatment of consignment creditors in Class 4 from the claims of the general unsecured creditors; therefore, the Court overrules the classification objection.[3]

**B. The Effect of Confirmation Upon Claims Against Third Parties: The Reach of 11 U.S.C. § 524(e)**

Textron and Transamerica objected to Plan ¶¶ 10.03, 10.04 and 12.04, which originally stated:

10.03 NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER **DEBTOR, REORGANIZED DEBTOR,** NOR THE SHAREHOLDERS, OFFICERS OR DIRECTORS SHALL BE PERSONALLY LIABLE FOR THE OBLIGATIONS AS SET FORTH IN THIS **PLAN** AND SHALL BE DISCHARGED AND RE-

**3.** Debtor's justification for separate classification as a good business reason rather than an effort to get votes for the Plan is also supported by the different treatment of the claims as discussed, in *dicta,* in *Greystone. See Matter of Greystone,* 995 F.2d 1274, 1280–81 (5th Cir.1991), *cert denied,* 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992).

LEASED FROM LIABILITY FOR ALL **CLAIMS AND DEBTS.**

10.04 NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER **DEBTOR, REORGANIZED DEBTOR,** THE OFFICERS, GUARANTORS, AND DIRECTORS OF THE DEBTORS NOR THE SHAREHOLDERS SHALL BE DISCHARGED AND RELEASED FROM ANY LIABILITY FOR **CLAIMS** AND **DEBTS** UNDER THIS **PLAN,** HOWEVER, THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY **CLAIM** OR **DEBT** SO LONG AS THE **PLAN** IS NOT IN DEFAULT SHALL BE THE **PLAN.**

\*　　\*　　\*　　\*　　\*　　\*

12.04 All **Debts** that arose before the **Confirmation Date** and any **Debt** of a kind specified in Section 502(g), 502(h) or 502(i) of the **Code,** whether or not a proof of claim based on such **Debt** is filed or deemed filed under Section 501, whether or not such **Claim** is allowed under Section 502; and whether or not the holder of such **Claim** has accepted this **Plan;** are, fully and finally satisfied by this **Plan.**

(Debtor's Plan of Reorganization Dated Sept. 13, 2002 at 8–9.) [4]

Debtor subsequently modified the Plan in open court on November 20, 2002,[5] by omitting paragraph 10.04 and replacing 10.03 with the following language:

10.03 NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER **DEBTOR, REORGANIZED DEBTOR,** THE OFFICERS, GUARANTORS, AND DIRECTORS OF THE DEBTORS NOR THE SHAREHOLDERS SHALL BE DISCHARGED AND RELEASED FROM ANY LIABILITY FOR **CLAIMS** AND **DEBTS** UNDER THIS **PLAN,** HOWEVER, ABSENT FURTHER COURT ORDER UPON NOTICE AND HEARING, THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY **CLAIM** OR **DEBT** SO LONG AS THE **PLAN** IS NOT IN DEFAULT SHALL BE THE **PLAN.** TO THE EXTENT NECESSARY, ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM ANY THIRD PARTY IS SPECIFICALLY TOLLED FROM THE PERIOD OF TIME FROM THE BANKRUPTCY PETITION DATE UNTIL THE DATE UPON WHICH THE DEBTOR FAILS TO CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN.

(Debtor's Plan of Reorganization Dated Sept. 13, 2002 and attached to Order Confirming Debtor's Plan of Reorganization, as Modified at 8–9.) The Confirmation Order provides for a ten day cure period and relief from modified ¶ 10.3 upon "changed circumstances." (Order Con-

---

**4.** Bombardier does not object to this provision of the Plan.

**5.** Such amendment was, in this Court's view, necessary, because the Plan, as originally drafted, violated § 524(e).

firming Debtor's Plan of Reorganization, as Modified ¶ 16.)

Textron and Transamerica are not satisfied with the modification and continue to argue that modified ¶ 10.3 of the Plan (hereinafter "¶ 10.3") violates § 524(e) to the extent it acts as a release of their claims against Debtor's principal, Kahn.

Confirmation of a plan of reorganization "discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). Section 524(e) states that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

### 1. Availability of the Relief Requested

■ Generally, a plan of reorganization cannot be confirmed if the Plan purports to release guarantors of the debtor's debts and a creditor objects to the release. *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir.1987). Paragraph 10.3 specifically states that guarantors are not discharged or released from any liability under the plan. Therefore, on its face, the Plan does not purport to grant a release for third parties, such as Mr. Kahn. Further, nothing in ¶ 10.3 affects Kahn's ultimate liability under any guaranty agreement. Instead, ¶ 10.3 merely controls the timing of when a claim, if any, against Kahn, can be brought. And, under the Plan, as modified, the temporary stay could lift upon uncured default under the plan, or upon a change in circumstances for Mr. Kahn, i.e. recovery of the Nigerian Funds. If the Objecting Creditors are not paid under the Plan, they may pursue their guarantor, Mr. Kahn. If his circumstances improve, or if the situation warrants, the Objecting Creditors can seek relief from the stay imposed by the Plan.

■ On the issue of the effect of confirmation on the claims against third parties, this Court does not write on a clean slate. The Fifth Circuit has held that post-confirmation *permanent injunctions* that effectively release a non-debtor from liability are prohibited. *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995). However, temporary injunctions

> may be proper under unusual circumstances. These circumstances include (1) when the non-debtor and debtor enjoy such an identity of interest that the suit against the non-debtor is essentially a suit against the debtor, and (2) when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization.

*Id.*

This Court is also guided by a recent, well-reasoned, opinion from this District. In *In re Seatco*, 257 B.R. 469 (Bankr. N.D.Tex.2001), the court considered whether a *temporary injunction* in a plan of reorganization enjoining a creditor from pursuing the debtor's principal violated § 524(e). Specifically, the temporary injunction sought would bar the creditor from recovering under a guarantee signed by the principal as long as the debtor was not in default under the plan. *Id.* at 475. The plan provision did not affect the principal/guarantor's liability to the creditor, it merely prohibited enforcement of the guarantee agreement for the term of the plan. *Id.* Furthermore, the plan specifically allowed the creditor to enforce the guarantee agreement for any amounts not covered by the plan but due and owing to the creditor. *Id.*

In the present case, Debtor does not expressly seek even a temporary injunction. Instead, ¶ 10.3 purports to act as a stay to the pending state court actions against Kahn by directing recovery first through the Plan process, and tolling the

Objecting Creditors' claims against Kahn during the pendency of the Plan.

■ Pursuant to 28 U.S.C. §§ 1332(b) and 157(a), the Court has jurisdiction to issue a post-confirmation stay as between Debtor's creditors and Kahn. A plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). The Court's authority to issue the limited stay[6] and toll the statute of limitations falls within its grant of equitable power under §§ 105(a) and 1123(b)(6) of title 11.

As in *In re Seatco*, 257 B.R. 469, ¶ 10.3 does not affect Kahn's ultimate liability to the Objecting Creditors. The Objecting Creditors' claims are being repaid in full through the Plan. Further, the tolling of all causes of action against Kahn pending the Debtor's repayment does not affect Kahn's ultimate liability to the Objecting Creditors, but instead preserves such causes of action. If the Debtor defaults under the plan, after a short notice period, creditors are free to take action against the Debtor and the guarantor, Mr. Kahn. Kahn testified that he is the sole director of the Debtor and is the driving force behind the success (or failure) of the Debtor company. Kahn further testified that being forced to defend the state court lawsuits would be a considerable drain on his time and resources, which would be better used to navigate the Debtor's day-to-day business (and reorganization) efforts. Subjecting Mr. Kahn's equity interest to seizure by these floor plan lenders, while the reorganized Debtor is operating and repaying creditors could have an adverse effect on all other parties in this proceeding. The Objecting Creditors did not offer any evidence to rebut Kahn's testimony.

The *Zale* unusual circumstances test has been met in this case. The success or failure of the Debtor lies mainly, if not exclusively, with the efforts, reputation, and dedication of Mr. Kahn. For all practical purposes, at this time, he is the Debtor. This Debtor will survive and creditors will be paid under the plan only if Mr. Kahn is allowed to conduct the business of the Debtor without distraction. Debtor and Kahn enjoy such an identity of interest that the prosecution of the claims, or attempted collection of any judgments against Kahn would be tantamount to prosecuting and/or seeking collection from the Debtor. Further, Textron and Transamerica's pursuit of judgment or recovery against Kahn individually would have an adverse impact on the successful reorganization of the Debtor.

### 2. Stay versus Temporary Injunction

■ Section 362 of the Bankruptcy Code provides for an automatic stay. The § 362 automatic stay, however, terminates once the plan is confirmed and the property of the estate vests in the debtor. *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n,* 997 F.2d 581, 589 (9th Cir.1993). The Plan vests the property of the bankruptcy estate in the Debtor upon confirmation. (Plan of Reorganization Dated Sept. 13, 2002 ¶ 12.02.) Therefore, the automatic stay will terminate upon confirmation of the Plan. Thus, § 362 does not provide the relief which Debtor seeks and the Bankruptcy Code does not expressly provide

**6.** Issuance of a temporary injunction or stay does not violate the Anti–Injunction Act, 28 U.S.C. § 2283, because § 105(a) is an express authorization by Congress that allows bankruptcy courts to issue injunctions staying state court proceedings. *In re Fussell,* 928 F.2d 712, 716 (5th Cir.1991). To the extent either Textron or Transamerica has a pending claim in state court, a temporary injunction would not violate the Anti–Injunction Act with respect to those suits.

another mechanism under which Debtor, and Kahn, would be entitled to a "stay."

 It appears that although ¶ 10.3 is not precisely couched as a temporary injunction it has the effect of one. Thus, the Court must treat ¶ 10.3 as a temporary injunction and Debtor must meet the evidentiary burden of obtaining an injunction. In order to obtain injunctive relief, the moving party must show: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause to the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest. *Canal Authority v. Callaway*, 489 F.2d 567 (5th Cir.1974).

 The Court finds that the foregoing factors are met. "Chapter 11 of the Code was adopted to give business in financial difficulties an opportunity to reorganize their business affairs, provide repayment to their creditors, and emerge from their bankruptcy case in a financially sound manner." *In re Seatco*, 257 B.R. at 477. Debtor has shown that it intends to reorganize its business affairs and upon confirmation of the Plan, repay its creditors' claims, both secured and unsecured, in full. Further, Debtor submitted evidence that it would emerge from its bankruptcy case and begin operating profitably. These facts are undisputed.

The Code gives Debtor the right to attempt reorganization. Debtor has shown that, given the opportunity, it can likely reorganize successfully. The Debtor will suffer irreparable injury, *i.e.*, it will not successfully reorganize, if Transamerica and Textron are permitted to pursue their individual guaranty claims and/or judgments against Kahn, Debtor's largest asset

at the outset of Debtor's reorganization. Debtor's inability to reorganize will not only harm Debtor, but also Debtor's creditors since any liquidation in this case would result in little to any recovery for any creditor. The harm to Transamerica and Textron, on the other hand, is simply that they are not being repaid as quickly as they would like. They are free to pursue Kahn on his guaranties in the event Debtor defaults on its Plan payments and the default is not cured within 10 days. At that time, they need only to obtain an order from this Court lifting the "stay" and allowing them to proceed against Kahn directly. The harm to Debtor far outweighs the harm to Transamerica and Textron.

Finally, the granting of a temporary injunction or "stay" does not disserve the public interest. "Issuance of the injunction will facilitate the Debtor's successful reorganization which is in the public's interest." *In re Seatco*, 257 B.R. at 478. Accordingly, Paragraph 10.3 and the Plan as modified, are approved.