**IN RE Monica Laura TOWLER,
Debtor.**

**Bankruptcy Case No. 12–10126 EEB**

United States Bankruptcy
Court, D. Colorado

May 28, 2013

---

**21.** *Id.* at 811.

Mark Saiki, 398 Cypress St., Broomfield, CO 80020, for Debtor.

Chapter 13

## ORDER DENYING CONFIRMATION DUE TO DISCRIMINATORY TREATMENT

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER comes before the Court on the Debtor's Motion to Confirm Chapter 13 Plan. The Chapter 13 trustee ("Trustee") has objected to the Debtor's proposed plan because of its preferential treatment of a nondischargeable claim owed to the State of Colorado (the "State") arising from the overpayment of unemployment benefits. In the Debtor's plan, she affords this claim § 507(a)(8) priority, classifying it with her state and federal income tax obligations. Alternatively, she proposes to treat the claim as a general, unsecured debt, but to place it in a separate class receiving full repayment, rather than including it with the other general unsecured creditors, who will receive less than a 1% distribution. For the reasons set forth below, this plan cannot be confirmed because: (1) the State's claim is not entitled to priority treatment as a "tax" or "tax penalty;" and (2) the alternative proposal of separate classification and more favorable treatment of the State's claim would discriminate unfairly against the other class of unsecured claims.

## I. BACKGROUND

The State previously filed an adversary complaint against Debtor, in which it asserted a nondischargeable claim under 11 U.S.C. § 523(a)(2)(A) and 523(a)(7),[1] arising from the Debtor's failure to report her part-time, temporary employment to the Colorado Department of Labor and Employment, while receiving unemployment benefits. Once the Department learned of her part-time work, it made a determination that an overpayment of benefits had been made (the "Overpayment"). The debtor appealed this determination and, on appeal, the hearing officer found that the Debtor had "intentionally failed to report her earnings, and her failure to report constituted a willful misrepresentation." The Overpayment consists of $2,850.00 in reimbursement payments for overpaid unemployment compensation, $1,425.00 in statutory penalties, and $915.31 in collection costs, totaling $4,576.56 after subtracting the $613.75 that the State has already recouped. The Debtor and the State have stipulated to the entry of a nondischargeable judgment in this amount.

The treatment of the State's claim in the plan will have an appreciable impact on the other unsecured creditors. The claims bar date has already passed in this case. Creditors have filed proofs of claim asserting the following types and amounts of claims:

---

1. Unless expressly stated otherwise, all future references to "Section" or "§" shall refer to Title 11, United States Code.

$8,368.16 secured claims
$10,101.60 priority claims (state and federal tax claims)
$40,063.27 non-priority claims (including the Overpayment)

If the Overpayment is to be paid as a priority claim or is to be placed in a separate class, as the Debtor's plan proposes, then the non-priority class will aggregate $35,486.71. If the non-priority class receives only $200, to be shared *pro rata*, each creditor would receive less than a 1% distribution. On the other hand, if the Overpayment is placed in the same class with all other non-priority unsecured claims, and the Debtor contributes to this whole class the funds she is trying to earmark for the State ($4,576.56) plus $200, then each creditor in this class would receive a 12% distribution.

## II. DISCUSSION

### A. Priority Claim Status: is the Overpayment a "Tax" or "Tax Penalty?"

■ The Debtor claims that the Overpayment is entitled to priority treatment under either § 507(a)(8)(D) as an employment tax, (E) as an excise tax, or (G) as a tax penalty. Regardless of the specific subpart, all of § 507(a)(8) requires the debt to be either a tax debt or a penalty related to a tax debt before it will qualify for priority treatment under this subsection.[2] Not every obligation owed to a governmental unit, however, constitutes a "tax." The government "exacts" many types of payments from its citizens. An "exaction" is the "action of demanding and enforcing payment (of fees, taxes, penalties, etc.)." [3] Some exactions are clearly not

taxes. For example, the fine associated with a speeding ticket is not a tax nor is it a penalty related to a tax.

■ Unfortunately, the Bankruptcy Code does not define its use of the term "tax." In *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), the Supreme Court cautioned courts applying § 507(a)(8) to look beyond the label of "tax" that might appear in a particular statute and instead to employ a "functional analysis" as to the purpose behind the specific exaction. The Supreme Court recognized a distinction between a "tax" and a penalty related to a tax, on the one hand, and a "penalty" that is unrelated to a tax, on the other hand. "[A] tax is an enforced contribution to provide for the support of government; a penalty, as the word is here used, is an exaction imposed by statute as punishment for an unlawful act." *Id.* at 224, 116 S.Ct. 2106 (citing *United States v. La Franca*, 282 U.S. 568, 572, 51 S.Ct. 278, 75 L.Ed. 551 (1931)). It applied this functional approach in the context of an IRS penalty assessment. The steel company was required to make annual contributions to an employee pension plan under ERISA. The debtor failed to make an annual contribution of $12.4 million and the IRS assessed an exaction of 10% of the deficiency. The lower courts found the exaction to be a non-tax related penalty rather than an excise tax and the

---

**2.** Section 507(a)(8) also includes customs duties, but since the debt in question is clearly not a customs duty, the Court has omitted any reference to customs duties for the sake of simplicity.

**3.** *Exaction Definition*, Oxford English Dictionary Online, OED.com, http://www.oed.com/view/Entry/65523?redirectedFrom=exaction (last visited May 23, 2013).

Supreme Court agreed. *Id.* at 226, 116 S.Ct. 2106.

*CF & I* continued a long line of cases applying this functional analysis when determining whether an exaction is a tax under the Bankruptcy Code. For example, in *New Jersey v. Anderson,* 203 U.S. 483, 27 S.Ct. 137, 51 L.Ed. 284 (1906), the Supreme Court held that a tax is a pecuniary burden where all those within the same class pay like amounts, those amounts are set by statute, and the consent of those paying is unnecessary. *Id.* at 492, 27 S.Ct. 137. In *City of New York v. Feiring,* 313 U.S. 283, 61 S.Ct. 1028, 85 L.Ed. 1333 (1941), it defined taxes as "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Id.* at 285, 61 S.Ct. 1028. The Supreme Court recently reaffirmed its approach to distinguishing between taxes and penalties in *National Federation of Independent Business v. Sebelius,* —— U.S. ——, 132 S.Ct. 2566, 2596–97, 183 L.Ed.2d 450 (2012).

 Applying the functional test to the present case, the Court looks first to the language of the statute imposing the exaction on this Debtor. Section § 8–81–101(4)(a) of the Colorado Revised Statutes provides in relevant part:

> Any person who has received any sum as benefits under [the Colorado Employment Security Act] to which he was not entitled shall be required to repay such amount to the division for the fund. Such sum shall be collected in the manner provided ... except that the division may waive the repayment of an overpayment if the division determines such repayment to be inequitable.
>
> If any person receives any such overpayment [of unemployment benefits] because of his or her false representation

or willful failure to disclose a material fact, inequitability shall not be a consideration in any civil, administrative, or criminal action, and the person shall be required to pay the total amount of the overpayment, which shall be paid into the unemployment trust fund, plus a penalty of fifty percent of such overpayment, which shall be paid into the unemployment revenue fund. In addition, such person may be denied benefits, when otherwise eligible, for a four-week period for each one-week period in which such person filed claims for or received benefits to which he or she was not entitled.

Colo.Rev.Stat. § 8–81–101(4)(a)(I)–(II).

The language of this statute is punitive in nature. It imposes a 50% penalty and collection costs on the violator. For each week in which a person violates the statute, that person may be ineligible for four weeks of future benefits. The exaction serves primarily to punish the unlawful act of failing to disclose material information regarding eligibility for unemployment benefits. And while it imposes penalties, those penalties are not tied to a tax. The reimbursement portion of the Overpayment lacks the characteristics of a tax. The statute does not exact this payment from an individual in order to fund the cost of government generally.

It does not even function as the means by which Colorado's unemployment program is funded. Colorado's unemployment benefits are funded by a combination of employer premiums and state and federal funds. When the State exacts payment into this program from the employer it is in the nature of a tax because its purpose is to fund this government program. The cases on which the Debtor relies in her brief are cases in which the employer owes payments. This is fundamentally different from the present case in

which the State has imposed penalties and demanded repayment of benefits to which this individual Debtor was not entitled. The exaction imposed on the Debtor was not an exaction imposed on individuals in order to fund this program. It was instead a punitive sanction attributable to her willful misrepresentation to the State of her unemployment status. Accordingly, the Overpayment is not entitled to priority status under § 507(a)(8).

### B. Unfair Discrimination Test

The Debtor alternatively proposes to separately classify the Overpayment and treat it more favorably. The Bankruptcy Code permits the designation of separate classes of unsecured claims and, by implication, different treatment of separate classes; but it stops short of permitting any manner of classification. It establishes one limitation: no "unfair" discrimination.

> [T]he plan may . . . designate a class of classes of unsecured claims, as provided in section 1122 of this title, but may not *discriminate unfairly against any class* so designated. . . .

11 U.S.C. § 1322(b)(1) (emphasis added). The issue here is whether it is "unfair" to prefer a nondischargeable claim over other unsecured debts.

■ Unfortunately, the Code does not define its use of the term "unfair." It does provide a few specific examples of permissible discrimination. In § 510, it subordinates claims whenever nonbankruptcy law would do so and it incorporates common law principles of equitable subordination. Section 1122, which is incorporated by reference into § 1322(b)(1), allows for separate classification of every unsecured claim "that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). Section

1322(b)(1) also allows separate classification of "consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims." Despite no statutory provision, there are other clear cases that no one would seriously question. If a debtor separately classified a creditor out of personal enmity, no one would dispute the unfairness of the plan. Likewise, if the debtor proposed more favorable treatment for family or friends, based only on a personal connection, the plan would never withstand attack.

Beyond these easy examples, courts have attempted to define "unfair" by promulgating various multi-factor tests, the most prominent of which is known as the *Leser/Wolff* test. It considers whether: (1) the discrimination has a reasonable basis; (2) the debtor can carry out a plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly related to the basis or rationale for the discrimination. *Mickelson v. Leser (In re Leser)*, 939 F.2d 669, 672 (8th Cir.1991); *AMFAC Dist. Corp. v. Wolff (In re Wolff)*, 22 B.R. 510, 512 (9th Cir. BAP 1982). Some courts add a fifth factor that weighs whether the less favored class is receiving a meaningful repayment. *See, e.g., In re Kovich*, 4 B.R. 403, 407 (Bankr.W.D.Mich. 1980).

There are two basic problems with a multi-factor approach, such as the *Leser/Wolff* test. First, some of these factors add very little to the analysis. "Good faith" is redundant, as the Code already sets forth a good faith confirmation requirement in § 1325(a)(3). The "reasonable basis" factor is as inherently vague and subjective as the term "unfair" and, therefore, provides little guidance. Some courts substitute "rational" for reasonable to avoid this criticism, but it is no less

subjective. *See, e.g., In re Husted,* 142 B.R. 72, 74 (Bankr.W.D.N.Y.1992).

Second, this multi-factor test, and others like it, rarely assist a court in reaching a decision. They do not indicate whether all of the factors must be satisfied, or even whether a simple majority is required. The factors listed are almost always "illustrative" rather than "exclusive." They do not tell the court how much weight should be assigned to any one factor. In short, analyzing the factors rarely compels a particular outcome. At the end, the court is still left with making an inherently subjective decision. One circuit court candidly remarked that "this is one of those areas of the law in which it is not possible to do better than to instruct the first-line decision maker, the bankruptcy judge, to seek a result that is reasonable in light of the purposes of the relevant law, which in this case is Chapter 13 of the Bankruptcy Code; and to uphold his determination unless it is unreasonable (an abuse of discretion)." *In re Crawford,* 324 F.3d 539, 542 (7th Cir.2003).

■ Instead of adopting a multi-factor test, courts must answer the fundamental underlying question: from whose perspective do we judge unfairness? A minority of courts have indicated it should be assessed from the debtor's perspective. *See, e.g., In re Machado,* 378 B.R. 14, 17 (Bankr.D.Mass.2007); *In re Lawson,* 93 B.R. 979, 984 (Bankr.N.D.Ill.1988). If so, then giving preferential treatment to a nondischargeable debt serves a valid purpose because it fosters the Debtor's fresh start. Other courts hold "unfairness" should be judged from the unsecured creditors' perspective. *See, e.g., McCullough v. Brown,* 162 B.R. 506, 511–13 (N.D.Ill. 1993); *In re Smalberger,* 157 B.R. 472, 475 (Bankr.D.Or.1992), *aff'd* 170 B.R. 707 (D.Or.1994). There is also the option of judging unfairness from a social policy perspective based on society's need to have certain types of debts repaid, such as support obligations.

Arguing against imposing any particular viewpoint, one commentator stated that "[f]airness, unlike beauty, is not simply in the eye of the beholder." Stephen L. Sepinuck, *Rethinking Unfair Discrimination in Chapter 13,* 74 Am. Bankr.L.J. 341, 361 (2000). This commentator advocates for a test that is tied to the underlying policies of the Bankruptcy Code. In theory, this approach is very appealing, but the only policy he points to is that of equal treatment of like creditors. *Id.* at 361–362. This is a core principle of the Code. However, if Congress has seen fit to allow debtors to discriminate, as long as it is done "fairly," then the principle of equal treatment does little to answer the question of when it is fair to deviate from equal treatment.

To answer the question of whose perspective is relevant to judging "unfairness," the Court need look no further than the statute itself. It says the plan may not discriminate unfairly "against any class so designated." The focus of the statute, therefore, is on the less favored class of creditors. Whether or not a proposed classification and different treatment benefits the debtor is irrelevant, unless it is also fair to the less favored creditors. Thus, this Court must determine whether the Debtor's proposed preferential treatment of the Overpayment is somehow advantageous for her less favored creditors.

Non-priority unsecured creditors will sometimes be better off if a particular debt or type of debts are favored because doing so will increase their overall chances of recovery. Sometimes the discriminatory treatment will decrease the debtor's expenses and thereby free up more funds to pay unsecured creditors. For example, paying the rent arrears in full on a govern-

ment-subsidized apartment in order to avoid eviction and in turn a much higher housing cost elsewhere may result in long term cost savings that will benefit creditors. *See* Sepinuck, *supra,* at 372–73. Sometimes the discrimination will serve to safeguard the debtor's source of income to make plan payments, such as paying a restitution order to avoid incarceration or paying traffic fines that would otherwise lead to the suspension of the debtor's driver's license. *Id.* at 373. Or the benefit may be more indirect but nevertheless vital to the debtor's livelihood, such as paying a healthcare provider whose continued services are necessary for the debtor's health and well-being. *Id.* at 376.

Sometimes the discriminatory treatment will strengthen the debtor's business and thereby increase the chances of recovery for all creditors. In *In re Bernhard Steiner Pianos USA, Inc.,* 292 B.R. 109 (Bankr. N.D.Tex.2002), the chapter 11 debtor proposed more favorable treatment of consignors of used pianos. While the debtor's business included the sale of new pianos, it relied heavily on consigned pianos. "[C]onsignment creditors were separately classified so … Debtor could begin expeditiously to repair its tarnished … name in a small market. Improving the consignment public's perception of this Debtor and restoring trust in the Debtor among potential consignors as soon as possible is important to the success of the reorganization overall." *Id.* at 114. Of course, this basis for discrimination presumes that the less favored class is better off with reorga-

nization than liquidation. If this is true, then an overly restrictive view of unfair discrimination may actually harm these creditors. "If the price of equality of treatment is less recovery for everyone, then that price is simply too high." Sepinuck, *supra,* at 374.

■ In the present case, the Debtor asserts that if she does not separately classify and fully repay the Overpayment, she might lose her right to receive unemployment compensation in the future and she might need it at some point to fund her plan. This assertion is too speculative. There has been no showing that the Debtor is likely to lose her job during the life of her plan. Moreover, Colo.Rev.Stat. § 8–81–101(4)(a)(II) provides that a debtor *may* lose future unemployment benefits if she falsely or willfully misrepresents her employment status. It is only one of several possible sanctions. And if it is imposed, it will be because of a willful misrepresentation, not because she has failed to fully repay the debt by a certain date. More importantly, failing to give preferential treatment in her plan will not cause her to lose her job or to have less with which to repay all of her creditors. From the perspective of the other general unsecured creditors class, her full repayment of this debt will only benefit the Debtor.

Is the nondischargeable nature of this debt a sufficient basis by itself to justify more favorable treatment? A minority of courts have held that it is.[4] Far more courts hold that it is not a sufficient basis.[5]

---

**4.** *In re Gregg,* 179 B.R. 828, 830 (Bankr. E.D.Tex.1995); *In re Boggan,* 125 B.R. 533, 534 (Bankr.N.D.Ill.1991); *In re Freshley,* 69 B.R. 96, 98 (Bankr.N.D.Ga.1987).

**5.** *Groves v. LaBarge (In re Groves),* 39 F.3d 212, 216 (8th Cir.1994); *Labib–Kiyarash v. McDonald (In re Labib–Kiyarash),* 271 B.R. 189, 196 (9th Cir. BAP 2001); *Eck v. Willis (In re Willis),* 197 B.R. 912, 914–15

(N.D.Okla.1996); *In re Knecht,* 410 B.R. 650, 655 (Bankr.D.Mont.2009); *Marshall v. Belda (In re Belda),* 315 B.R. 477, 484 (N.D.Ill. 2004); *In re Simmons,* 288 B.R. 737, 748 (Bankr.N.D.Tex.2003); *In re Coonce,* 213 B.R. 344, 346 (Bankr.S.D.Ill.1997); *In re Chandler,* 210 B.R. 898, 902–03 (Bankr.D.N.H.1997); *In re Tucker,* 150 B.R. 203, 205 (Bankr.

Certainly, if we are to judge "unfairness" from the perspective of the less favored class, it is not. As illustrated above, there are times when the less favored creditors will benefit as well from the discriminatory treatment given to a nondischargeable debt, but not as a general rule.

What the Debtor is attempting to do is to elevate all nondischargeable debts to the status of priority claims. Congress chose to give some types of debts both priority and nondischargeability status. For example, domestic support obligations are expressly granted priority treatment in § 507(a)(1) and are nondischargeable under § 523(a)(5). Likewise, certain tax obligations are both nondischargeable and given priority treatment. 11 U.S.C. § 507(a)(8), 523(a)(1). Nondischargeable student loans may qualify for special treatment, not as priority debt, but as long term unsecured debts under § 1322(b)(5). These special Code provisions reflect legislative policy choices to prefer these debts. If Congress wanted to extend more favorable treatment to all nondischargeable debts, it could have done so. Perhaps it did not because many of the other types of nondischargeable debts reflect wrongdoing, such as fraud or violations of the law. Perhaps Congress did not wish to force non-priority creditors to, in essence, bear the burden of paying the debtor's penalties.

The Debtor raises two more arguments in support of her proposed classification. First, she argues that, in *In re Sharp*, 415 B.R. 803 (Bankr.D.Colo.2009), this Court has previously ruled that, once a debtor has contributed her projected disposable income to the plan, any excess income may be used by the debtor in any way she wishes, including payment toward a nondischargeable debt. The Debtor's reliance on *Sharp*, however, is misplaced. That case involved an above-median income debtor who calculated his projected disposable income according to the means test, which relies on standard deductions instead of actual expenses, thereby allowing the possibility of "discretionary income" when actual expenses are less than the standard deductions. In the present case, the Debtor is a below-median income debtor and she cannot rely on the means test. Her expenses are derived from Schedule J, in which she must list only her actual, reasonable, and necessary expenses. As a result, a below-median income debtor should never have "discretionary income."

Moreover, the Court's ruling in *Sharp* was based on its adoption of the Ninth Circuit's interpretation of "projected disposable income" in § 1325(b)(1)(B) as a mechanical test in *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868 (9th Cir.2008). Under this interpretation, the historical income and standard deduction methodology found in § 707(b)'s means test is "projected" or multiplied by the number of months in the applicable commitment period specified in the plan. *Kagenveama*'s mechanical test interpretation was expressly overruled by the Supreme Court in *Hamilton v. Lanning*, 560 U.S. 505, 130 S.Ct. 2464, 177 L.Ed.2d 23 (2010). In *Lanning*, the Supreme Court adopted a forward-looking approach that allowed for deviation from the means test calculation in order to take into account changes that were known or virtually certain at the time of confirmation. Shortly thereafter, in *Ransom v. FIA Card Services, N.A.*, —— U.S. ——, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011), the Supreme Court rejected an interpretation of projected disposable income that would have allowed the debtor to claim a standard deduction when in fact the debtor had no actual expense in the

N.D.Ohio 1992); *In re Tucker,* 130 B.R. 71, 73

(Bankr.S.D.Iowa 1991).

category of the deduction. By taking into account known and virtually certain changes and rejecting "phantom deductions," the Supreme Court has signaled that a court's interpretation of this phrase must seek to determine what a debtor can reasonably afford to pay, rather than limiting payment to a mechanical test, which may leave the debtor with substantial excess income. Therefore, any reliance on *Sharp*'s reference to "discretionary income" is now questionable.

Finally, the Debtor argues that the Court should allow this discrimination because the Debtor has extended her plan from the mandatory three-year plan required of this below-median income debtor to a five-year plan. Any suggestion that she has done so in order to treat her general unsecured creditor class more fairly is easily refuted. She is proposing to pay: $231 for 3 months, $300 for 27 months, and $427 for 30 months, aggregating $21,603.00. With the proposed monthly payment schedule, at the end of 36 months, she will only have paid into the plan $11,355.00. This amount is insufficient to pay her priority debts ($1,961 to trustee, $4,400 in attorney fees, $8,785 in priority federal taxes, and $1,361 in priority state taxes), which total $16,507. Consequently, she has proposed a longer plan, not to benefit her non-priority unsecured creditors, but to allow her to repay priority debts, as well as this nondischargeable debt. Despite a five-year plan, she still only proposes to pay her general unsecured creditor class $200.

## III. CONCLUSION

Because the State's claim is neither a "tax" nor a "tax penalty" and, thus, not entitled to § 507(a)(8) priority and because the alternative separate classification of the Overpayment discriminates unfairly, this plan cannot be confirmed.